SNYDER v. KING.

1. CARRIERS—INJURIES TO HORSES IN TRANSIT—CLAIMS—TIME FOR
FILING—INTERSTATE COMMERCE.

The report of the claim of a shipper of an interstate car
of horses for injuries to the animals during transit made
by defendant's agent at the point of destination was a
substantial compliance with the requirement of the uni-
form livestock contract under which the horses were
shipped that in the event of the accrual of damages a
verified claim therefor be made in writing within five
days from the time the stock is removed from the car.

2. NEGLIGENCE—DEFINITION—QUESTION OF LAW.

Negligence is not a question of law except in cases where
the facts are such that all reasonable men would be
likely to draw the same inference therefrom.

3. CARRIERS—INJURIES TO HORSES IN TRANSIT—INTERSTATE COM-
MERCE—DIRECTED VERDICT.

In an action against a carrier for damages for injuries to
an interstate shipment of horses due to their escape
from a stock pen during the time they were in the pen
after they were unloaded for the purpose of being watered
and fed as required by the Federal statute (U. S. Comp.
Stat. 1916, § 8652), held, that it was not error to deny
defendant's motion for a directed verdict, sought on the
grounds that there was no negligence in handling the
horses at the intermediate point and that plaintiff's loss
resulted from the nature of the animals themselves.

4. SAME—CARRIAGE OF LIVESTOCK—NEGLIGENCE.

A duty rests upon the carrier to prevent the escape of ani-
mals unloaded for some reason incident to the trans-
portation.

5. SAME—CARRIAGE OF LIVESTOCK—CONTRACTS—STATUTES.

Such unloading, feeding and watering of the horses was
incident to the transportation, and, notwithstanding a
prejudicial provision in the uniform livestock contract
under which the horses are shipped, the recovery of dam-
ages for injuries sustained by the horses after being un-
loaded at such intermediate point cannot be defeated on

.  the ground that they were suffered when the horses were not being actually transported, a contract not being capable of overriding a Federal statute.[1]

Error to Oceana; Sullivan, J.   Submitted October 24, 1917.   (Docket No. 144.)   Decided December 27, 1917.          .

'  Assumpsit by William E. Snyder against Paul H. King and Dudley E. Waters, receivers of the Pere Marquette Railroad Company, for damages to horses in transit.   Judgment for plaintiff.   Defendants bring error.   Affirmed.

*Parker, Shields & Brown (Norris, McPherson, Harrington & Waer,* of counsel), for appellants.

*Hall & Greene* and *Hall, Gillard & Temple,* for appellee.

STONE, J.   This is an action for damages for a carload shipment of horses belonging to the plaintiff, moving from Chicago, Ill., to Hart, Mich., under a uniform livestock contract issued February 10, 1915. Some of the horses were sick when the shipment arrived at Hart, and three died later, the plaintiff claiming that the sickness and death were due to exposure at Waverly (near Holland), Mich., where the horses broke out of a stock pen; and the plaintiff also claimed an unreasonable delay on the part of the defendants in transporting the horses from Chicago to Hart.   The car of horses arrived at Waverly, Mich., at about 11 o'clock a. m. of February 11th, and as there was no

---

[1] As to statutory duties of carriers of livestock with reference to care of stock during transportation, see note in 44 L. R. A. 449.

On validity of stipulation in carrier's contract requiring notice of loss within specified time, as applied to loss due to carriers' negligence, see note in 17 L. R. A. (N. S.) 628.

On duty of carrier of livestock as to pens or yards at stations, see note in 44 L. R. A. 289.

train which would take the car to Hart, or an intermediate point within the 36 hours' limit fixed by the Federal law and the contract, the horses, 23 in number, were unloaded for water and feed, as required by that law.

The only question of negligence which the trial court submitted to the jury was the claimed negligence of the defendants in the handling of the stock at Waverly; the court ruling that no negligence was shown in the actual transportation of the horses. When the horses were unloaded at Waverly, as aforesaid, they were placed in an open stock pen built 4 feet 9 inches high out of 1 by 6 hemlock boards, and cedar posts set 4 feet apart. The pen was built in 1912 or 1913, and was about 74 feet long and 48 feet wide, divided into two parts with an open gate between. The boards were all nailed on the inside of the posts, except at each corner one set of boards had to be nailed and was nailed on the outside. There was testimony that 15 or 20 other cars of horses had been before unloaded into this same pen; that it was constructed similar to other horse pens used by railroad companies in unloading horses for feeding; that no horses had ever broken out of the pen before; and that the pen was in good condition, and was not rotten or decayed anywhere.

About an hour after the horses were first turned into the pen a large sorrel kicked some of the other horses, crowded them against the fence, and broke it down in the northwest corner of the pen. The sorrel horse in question was vicious to the other horses at the time it was in the stock pen, though he showed no signs of viciousness either before he was shipped, or after he was delivered to the consignee at Hart. The stock pen was immediately repaired, after the first break, and made as good as it was before. The horses were left untied in the pen, so that they might

exercise. No one watched the horses while they were in the pen, but the yardmaster testified:

"There wasn't any time for 30 minutes during the day perhaps but what I saw them. I had seen them not to exceed 5 minutes before they broke out the second time. I did not see them break out the second time."

The horses broke out again about 4 o'clock in the afternoon. They broke out at a different place, but at a place where the boards were nailed on the outside of the posts, in a corner. All but one of the horses escaped from the pen before the men arrived to stop them. The only horse which did not escape was the large sorrel which had been the cause of the trouble in the morning. Six of the horses were caught immediately, and 2 more about an hour afterwards. The remaining 14 horses ran 5 or 6 miles, and were out all night. Twelve of them were caught about 8 o'clock, and 2 about 10 o'clock the following morning. The 8 horses that were caught immediately were put back into the car, but were taken out of the car again the next morning to exercise. They and the other horses captured later were not put into the car finally until about 4 o'clock p. m. on February 12th. As to the condition of the weather at Waverly the yardmaster testified:

"The weather was warm; the sun was shining. I mean that it was a warm day for March or February; probably it was considerable above freezing. I wouldn't state just what the temperature was, but it was not freezing."

The plaintiff testified as to the condition at Hart as follows:

"The weather at that time was a cold northwest wind, the next thing to freezing, and about half rain. The air was chuck full of moisture, cold and disagreeable."

There was testimony that when the horses were first unloaded at Waverly, one of them, a bay mare, had a bad, very odorous, and green discharge from her nose, indicating that she had an old case of distemper or shipping fever; that this mare did not eat when taken out of the car at Waverly, and did not eat the following day. As soon as the horses were recaptured the defendants called in a local veterinary surgeon to examine them. He examined them and found all of them eating except the bay mare. He testified that she was discharging from the nose, and had a high temperature, and that her condition indicated that she had the distemper or shipping fever, and had had it from 4 to 7 days, and that the rest of the horses were all in good condition when recaptured. Some of the horses were sick when they arrived at Hart on the afternoon of February 13th, others became sick later, and 3 of them died. Plaintiff claimed that the horses suffered from sickness due to the exposure at Waverly, and that none of them had distemper when shipped. Plaintiff called as a witness a veterinary surgeon who testified that the horses had pneumonia when he treated them after their arrival at Hart, and that it might have been caused by the exposure.

The uniform livestock contract which the plaintiff signed, and under which the shipment in this case moved, contained the following provisions:

"No claim for damages which may accrue to the said shipper under this contract shall be allowed or paid by the said carrier or sued for in any court by the said shipper unless a claim for such loss or damage shall be made in writing, verified by the affidavit of the said shipper or his agent, and delivered to the traffic manager of the said carrier at his office in Detroit within five days from the time said stock is removed from said car or cars. * * *

"Livestock will be taken at the reduced rates fixed in the tariff only when a uniform livestock contract

is executed by the station agent and the consignor, and when the release on the back of said contract is executed by man or men who are to accompany said livestock. If consignor refuses to execute a uniform livestock contract, the livestock will be charged ten (10) per cent. higher than the reduced rates specified herein, provided that in no case shall such increase be less than one (1) per cent. per hundred pounds. * * *

"The railroad company does not assume any risks from the acts of the animals themselves, or to each other, such as biting or kicking; such risks must always be borne by the owner. * * *

"The said shipper is at his own sole risk and expense to load and take care of and to feed and water said stock whilst being transported, whether delayed in transit or otherwise, and to unload same; and neither said carrier nor any connecting carrier is to be under any liability or duty with reference thereto, except in the actual transportation of the same. * * *

"The said carrier or any connecting carrier shall not be liable for or on account of any injury sustained by said livestock occasioned by any or either of the following causes, to wit: Overloading, crowding one upon another, kicking, or goring," etc.

Plaintiff had shipped a number of cars of horses from Chicago to Hart, prior to the shipment in question, and had shipped them all under similar contracts, containing the clauses above set forth. The uniform livestock contract under which the shipment moved is part of defendants' published tariffs on file with the interstate commerce commission and the Michigan railroad commission, and in effect at the time. Such tariffs provide a rate of 36.8 cents per hundred pounds for livestock carried under and subject to the conditions of the uniform livestock contract, which was the rate paid by the shipper in this case. Under such tariff the shipper had the option of shipping his stock either subject to the terms and conditions of the uniform livestock contract, or under the liability imposed upon common carriers by the

common law, and the Federal and State statutes applicable thereto. In case the shipper chose to have his stock transported under a common-law liability bill of lading, the rate specified in the tariff was 10 per cent. higher than the rate paid in this case.

Plaintiff did not file his claim within 5 days as required by the contract; he not having filed it until March 8, 1915. The defendants gave notice of this defense under their plea of the general issue. The trial court held that the provision might be waived, and submitted the question of waiver to the jury. The facts upon this question were that immediately after purchasing and seeing about the shipment of the horses, plaintiff left Chicago and went back to Hart. When the horses did not arrive at the usual time, plaintiff went to learn the cause of the delay. One of the men on the freight train told him the horses had gotten out of the yards at Waverly. Plaintiff then went to defendants' local agent at Hart, and he telegraphed to Waverly and found that the horses were running at large. The weather at Hart was a cold northwesterly wind, the next thing to freezing, and about half rain. The plaintiff testified that he feared such weather would give the horses pneumonia, so he told said local agent about the condition the horses were in; that they would take cold; and that when they arrived at Hart he would refuse to take them, and the defendants could keep them; that the agent told plaintiff that they could not do that; that plaintiff must take care of them and do the best he could with them; that somebody had to take care of them. After the horses arrived, and before the plaintiff unloaded them, he again had a talk with defendants' agent, which he detailed as follows:

"He told me to take them, and to take care of them, and do the best I could with them. The horses were unloaded. I did as he told me; took them to the barn;

took the best care I could of them.  He [the agent] followed us into the barn, and I showed him the horses, and explained to him the condition they were in.  He gave me instructions at that time to take care of them the best I could, and whatever the damage was the company would pay it.  The condition of the horses was that some of them were seemingly all right— were all right.  I had three horses that never ate a mouthful after they came to the barn, and finally died. There were five others which it took me from one to three months to get in shape to do anything with them, and I came very near losing them.  I took all of the care anybody possibly could of the horses."

The defendants' local agent saw the horses two or three times a week after they were unloaded.  Defendants' local agent, called by the plaintiff for cross-examination under the statute, after testifying substantially the same as the plaintiff relating to said conversations, also testified as follows:

"*Q.* Didn't Mr. Snyder tell you that there would be a claim filed, and didn't you tell him to file his claim when he knew what his loss was?

"*A.* Yes, I did.  *  *  *  Mr. Snyder filed his claim with me some time later, and it was sent by me to the offices of the Pere Marquette at Detroit.

"*Q.* Before that you had wired the Pere Marquette in Mr. Snyder's behalf of the loss that had been sustained?

"*A.* Not that I remember of.

"*Q.* Didn't you make a report?

"*A.* Not by wire.  I wrote them a report by letter.

"*Q.* Either by wire or letter?

"*A.* By letter I did.

"*Q.* You made a report of this loss?

"*A.* Yes, sir.

"*Q.* When was that made?

"*A.* That was made shortly after the arrival, as to the condition on arrival.

"*Q.* Within a day or two?

"*A.* Yes, I think so.

"*Q.* Have you got that letter?

"*A.* I have not.

(After inquiry for the letter, and defendants' inability to produce it, counsel proceeded:)

"*Q.* And in that letter didn't you tell the officers of the company that you had persuaded Mr. Snyder to unload the car and file his claim?

"*A.* I don't remember as to how it was worded, but I gave them the condition of the car on arrival, and either stated or made it in such a way that a claim would be made.

"*Q.* So that you made it plain to them that you had made an arrangement for taking care of the loss between yourself and Mr. Snyder?

"*A.* I couldn't say as to that. I don't remember how the letter was worded, but I presume—

"*Q.* Will you speak a little louder?

"*A.* I don't remember as to how the wording of the letter was.

"*Q.* But that was the substance of it?

"*A.* That would be the substance of the report made. * * *

"*Q.* Didn't you tell Mr. Snyder to go ahead and take care of these horses, and when he knew what his loss would be to file his claim, and that it would be paid?

"*A.* I don't know whether I told him in those words, but I told him to take care of the shipment, and when he had the matter where he knew what the loss was to file his claim. As far as saying that it would be paid, I may have said it, but then he would know how it was intended. I couldn't pay the claim myself. I knew it would have to be investigated.

"*Q.* You told him that the company would take care of it?

"*A.* Would entertain the claim, certainly."

On examination by defendants' counsel this witness testified:

"*Q.* Do you remember, Mr. Story, when Mr. Snyder filed his claim with you, that was shown you by counsel for the other side, whether or not it is on the date—

"*A.* I think it is on the date.

"*Q.* March 8, 1915?

"*A.* Yes, sir.

"*Q.* Now, in this letter that counsel has spoken about, that you say you wrote to the officers of the railroad company, did you state in that letter any more than that the shipment had arrived, the condition that it had arrived in, and that a claim would be filed?

"*A.* I think not; I don't remember positively, but I believe that would be all the information I would give them, as to condition on arrival, and that a claim would be filed. * * *

"*Q.* Did you send that letter in your line of duty as an agent of the railroad company?

"*A.* I did.

"*Q.* You notified them of the damaged shipment, the same as you would notify them of any damaged shipment?

"*A.* I did; yes, sir."

At the close of plaintiff's case defendants made a motion for a directed verdict upon three grounds, all of which were again raised by appropriate requests to charge, which were denied. The case was submitted to the jury, and the trial resulted in a verdict and judgment for the plaintiff for $428.30 damages. Defendants have brought the case here for review, and error is assigned upon the refusal of the court to direct a verdict, and to charge the jury as requested. Defendants rely upon and urge the following propositions in this court:

(1) That the court should have directed a verdict for the defendants on the ground that plaintiff did not file a verified claim within 5 days after the arrival of the shipment.

(2) That the court should have directed a verdict for defendants on the ground that plaintiff did not show any negligence in the handling of the stock at Waverly.

(3) That a like verdict should have been directed on the ground that plaintiff's loss was due to the nature of the animals themselves.

(4) And a like verdict should have been directed on the ground that plaintiff's damage was incurred while the property was not being actually transported.

1. It is strenuously urged by defendants' counsel that the plaintiff cannot recover because he did not file a verified claim within 5 days; that the shipment was an interstate shipment and governed by the Federal law, and the decisions pertaining thereto; and that the validity, force, and effect of the provisions of the uniform livestock contract involved in the case are, under the decisions of the Supreme Court of the United States, Federal questions, not within the field of State law regulations, and the following cases are cited:   *Adams Express Co.* v. *Croninger,* 226 U. S. 491 (33 Sup. Ct. 148, 44 L. R. A. [N. S.] 257) ; *Michigan Cent. R. Co.* v. *Vreeland,* 227 U. S. 59 (33 Sup. Ct. 192, Am. & Eng. Ann. Cas. 1914C, 176) ; *Missouri, etc., R. Co.* v. *Harriman,* 227 U. S. 657 (33 Sup. Ct. 397) ; *Cincinnati, etc., R. Co.* v. *Rankin,* 241 U. S. 319, 327 (36 Sup. Ct. 555, L. R. A. 1917A, 265).   And that the United States Supreme Court has expressly held that the five-day provision is valid and cannot be waived, citing *Chesapeake, etc., R. Co.* v. *McLaughlin,* 242 U. S. 142 (37 Sup. Ct. 40) ; *Northern Pacific R. Co.* v. *Wall,* 241 U. S. 87 (36 Sup. Ct. 493) ; *Georgia, etc., R. Co.* v. *Blish Milling Co.,* 241 U. S. 190 (36 Sup. Ct. 541).   Counsel cite additional cases in their reply brief, but as we fully agree with the above contention, we do not cite them.

In our opinion the only serious question here involved is whether there was a substantial compliance with the 5-day requirement. In the *Blish Milling Company Case* it was held that the parties could not waive conditions "fixed by the agreement made under the published tariffs and regulations." The court, however, reached the conclusion that a telegram sent by the plaintiff to the defendant to the effect that the shipper "would make claim against the railroad for entire contents of car at invoice price," taken in connection with other telegrams identifying the ship-

ment, was a substantial compliance with the bill of lading provision in question, and therefore affirmed the Georgia court. In that case, Justice Hughes, after referring to the telegrams, and stating that the object of the stipulation was to secure reasonable notice, said:

"We think that it sufficiently apprised the carrier of the character of the claim, * * * and it is plain that no prejudice resulted. Granting that the stipulation is applicable and valid, it does not require documents in a particular form. It is addressed to a practical exigency, and it is to be construed in a practical way. The stipulation required that the claim should be made in writing, but a telegram which in itself or taken with other telegrams contained an adequate statement must be deemed to satisfy this requirement" —citing cases.

The object of the stipulation was reasonable notice. If the telegram was a substantial compliance with the stipulation in the *Blish Milling Company Case,* may not the report from the agent of the defendants at Hart to the office at Detroit, made after his own personal examination of the horses after they had been unloaded and under the circumstances stated, be deemed a substantial compliance with the contract in the instant case? We think so. An investigation by a claim agent followed, and there was no claim of surprise, or that defendants had been misled. In the *McLaughlin Case* the stipulation was the same as in the instant case, and the court said:

"Upon its face the agreement seems to be unobjectionable, and nothing in the record tends to establish circumstances rendering it invalid or excuse failure to comply therewith."

We think this reaffirms the doctrine of the *Blish Milling Company Case,* which is therein cited. Plaintiff's counsel in this court do not claim that the 5-day clause can be waived, but that there was a substantial compliance with it, "when the contract and the

facts are given practical construction in the light of the practical exigency which existed in the case." With this contention we agree.

2. It is defendants' claim that plaintiff showed no negligence on the part of defendants. Without discussing the question as to which party had the burden of proof, we think that the question could not be properly disposed of as one of law. We recognize the rule to be that the court cannot properly pass upon the question of negligence, except in cases where the facts are such that all reasonable men would be likely to draw from them the same inference. It appears that, without separating the horses, which might have been done by closing the gate and thus making two pens, the 23 young, active horses were placed together in one pen from which some of them had before escaped. Nobody was in charge to watch them, and nobody saw how the horses finally got out, and no one knew what knocked the boards off. It has been held that care is required in preventing the escape of animals, which are unloaded for some reason incident to the transportation. 6 Cyc. p. 437, and cases cited. The question of negligence in handling the horses at Waverly was one of fact, and defendants cannot justly complain of the charge of the court upon that question.

3. Should the court have directed a verdict for defendants on the ground that plaintiff's loss was due to the nature of the animals themselves? It seems to us that a good answer to this question is found in the uncontradicted testimony of the yardmaster: "I did not see them break out the second time." How can the court say, as matter of law, that the horses got out of the pen because of their viciousness? This affirmative defense was not claimed in the pleadings. The court did not err in refusing to direct a verdict on this ground.

4. Should the court have directed a verdict for defendants on the ground that the damage to plaintiff's stock was incurred while the property was not being actually transported? We have already stated that a duty rests upon the carrier to prevent the escape of animals while unloaded for some reason incident to the transportation. This interstate shipment was controlled by the Federal statute. See sections 8651 to 8658, U. S. Comp. Stat. 1916. Section 8652 provides that:

"Animals so unloaded shall be properly .fed and watered during such rest, either by the owner or person having the custody thereof, or in case of his default in so doing, then by the railroad * * * company * * * transporting the same, at the reasonable expense of the owner," etc.

In the instant case charges for feed and water were made by defendants, and paid by plaintiff. Under the Federal statutes the unloading, feeding, and watering are part of the transportation incumbent upon the carrier. It is evident that a clause in a contract cannot override a Federal statute. The contention of the defendants in this regard was decided adversely to them in *Chicago, etc., R. Co.* v. *Scott* (Tex. Civ. App.), 156 S. W. 294.

Upon this record we are of the opinion that the result reached upon the trial was justified and not erroneous, and that there was not a miscarriage of justice. The judgment below is therefore affirmed.

KUHN, C. J., and OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.