BOYD *v.* KING.

1. CARRIERS—RAILROADS—LIVESTOCK—DELAY—CLAIM—LIMITATION BY CONTRACT—WAIVER.
    Plaintiff's failure to present a claim within five days for shrinkage in value of live stock shipped over defendants' railroad, as required by the contract of carriage, was a defense that the carrier should have pleaded, in a suit to recover said loss, and omission to do so amounted to a waiver of that defense.[1]

2. SAME.
    Where plaintiff notified defendants twice by telegram, after being notified that the stock was being detained, that he should hold them responsible for any loss occurring by reason of their neglect to forward said stock according to shipping contract, defendants' contention that they were not notified of the claim for loss cannot be sustained.

3. SAME—DELAY—QUARANTINE—EMBARGOES—DEFENSES.
    Where the plaintiff shipped a car load of hogs and sheep over defendants' railroad, to be transported from Fremont, Newaygo county, Mich., to Buffalo, N. Y., and there was

[1]See note in 17 L. R. A. (N. S.) 628.

an embargo in the State of New York against importing
cattle into that State from the county of Wayne, Michi-
gan, and certain other counties, but not including the
county of Newaygo, defendants' action in unloading the
stock at Plymouth in Wayne county, thus bringing them
within the embargo and preventing their shipment to
Buffalo, rendered them liable for the resulting loss.

4. SAME—NOTICE—EMBARGOES—DEFENSES.

In said action, where the defendants accepted the ship-
ment of stock to New York State without informing plain-
tiff of the embargo existing in that State, or of the re-
fusal of a connecting railroad company to receive ship-
ments after a certain date because of said embargo, of
which they had notice, the fact of the embargoes would
not constitute a defense for their failure to fulfil their
contract of carriage.

5. SAME — INTERSTATE COMMERCE — LIVE STOCK — QUARANTINE —
FEDERAL STATUTES.

The Federal statute (section 8701 *et seq.,* U. S. Comp.
Stat. 1916), authorizing the United States secretary of
agriculture to promulgate orders of quarantine as to inter-
state shipments of live stock to prevent spreading of hoof
and mouth disease, is paramount and controlling, where
in conflict with the State law.

6. SAME—DEFENSES—DELAY.

Action by the secretary of agriculture under the Federal
statute would not constitute a defense, where the quaran-
tine orders issued by him did not apply to cars in transit,
and but for defendants' delay plaintiff's shipment could
have been forwarded to destination.

Error to Newaygo; Barton, J. Submitted January
15, 1918. (Docket No. 86.) Decided June 3, 1918.

Assumpsit by Edwin L. Boyd against Paul H. King
and another, receivers of the Pere Marquette Railroad
Company, for breach of a contract to transport cer-
tain stock. Judgment for plaintiff. Defendants bring
error. Affirmed.

*Parker, Shields & Brown (John C. Bills* and *Sew-
ard L. Merriam,* of counsel), for appellants.

*Hall, Gillard & Temple,* for appellee.

STEERE, J.  Plaintiff recovered in the circuit court of Newaygo county a verdict and judgment for $287.56 against the receivers of the Pere Marquette Railroad Company for a loss resulting from an alleged breach of contract sustained by him on a shipment of a carload of live stock delivered to defendants for shipment over their line from Fremont, Michigan, consigned to Buffalo, New York.

The declaration is upon the common counts in assumpsit and it is claimed that the contract was breached as follows:

"That the defendants did not carry said goods safely and within a reasonable time, but caused or permitted them to be damaged in the following respects: It delayed the carriage of said car. It also unloaded the sheep and hogs at Plymouth, Michigan. This was what was known at that time as an infected district. The public authorities at Buffalo had placed an embargo upon any sheep or hogs which had been unloaded in an infected district. Therefore, the carrier by unloading the sheep and hogs at Plymouth made it impossible for them to complete their contract of carriage to Buffalo, and it became and was necessary to allow said car to be carried to Detroit and the contents to be disposed of there."

Plaintiff resided at Fremont, engaged for many years dealing in farm products and buying and selling live stock, making shipments to Chicago, Buffalo, and Detroit markets. In the latter part of October, 1914, he purchased for shipment to market sufficient hogs and sheep for a carload and applied to defendants' agent, Mr. Frisby at Fremont, for a double-decked car in which to transport this carload of hogs and sheep to the Chicago market. Frisby then told him there was some uncertainty about getting the car to Chicago on account of a quarantine in that locality,

but the day before the car was to be loaded told him
he had found out it would run through to Chicago.
Plaintiff, however, decided to send the shipment to
the Buffalo market and loaded the car with 89 hogs
and 123 sheep, intending to send it by the usual rout-
ing through Canada. Frisby thereupon told him that
owing to a quarantine in Canada this could not be
done, but the car could be routed by Plymouth and
Toledo over the Lake Shore, showing him the route
on a map which he produced, and that there would
be not very much difference in time of transit be-
tween the two routes and plaintiff said "all right."
He testified that he had previously accompanied cars
of live stock from Fremont to Buffalo and also sent
cars through without any one in charge with a time
limit extended to 36 hours, as in this case, and the
stock was never unloaded en route nor had he ever
been called upon to pay a bill for unloading, feeding,
watering and reloading when the cars were unaccom-
panied.

This car was started on Saturday, October 31, 1914,
at about 11 o'clock, the stock having been previously
fed and watered that morning, in anticipation of its
arriving at Buffalo before daylight Monday morning,
when the stock could be put on the market that day,
which plaintiff testified had been his previous experi-
ence as to time of transit in making such shipments
from Fremont to Buffalo, a distance of 380 miles by
the Toledo and Lake Shore route.

The next he heard from the car was the following
Monday forenoon, November 2, when he was advised
by Frisby, the agent at Fremont, that the stock had
been unloaded at Plymouth and could not be reloaded
for its destination, and they wanted instructions from
him as to what disposition be made of it. He first
handed Frisby a telegram to forward, addressed to
him as agent of defendants, as follows:

"11-2-14

"Forward P. M. 2256 to Buffalo at once without any further delay or the contents of the said car belongs to the P. M. R. R. Co."

Being informed by Frisby later in the day that owing to a quarantine in Wayne county the car could not be reloaded and taken out of the county he served upon him the following to forward:

"11-2-14

"We note New York embargo. Sell stock now at Plymouth at Detroit to best advantage and we will hold P. M. R. R. Co. for all damages."

And being later advised that they refused to act upon such notice he served another, on November 3d, as follows:

"11-3-14

"Divert P. M. 2256 now at Plymouth, Mich., to Bishop, Bullen & Holmes to Detroit and we shall hold said P. M. R. R. Co. for all damages."

The load of stock was then taken to Detroit by defendants and there disposed of for plaintiff by the agents to whom he had diverted it, the diversion causing a loss of $454.40, for recovery of which this action is brought. The damages which he introduced evidence to prove and sought to recover for consisted of shrinkage in weight, a shortage of ten sheep in the number he had shipped, and the difference between the Buffalo and Detroit markets at the time the stock should have been delivered in Buffalo if carried through with reasonable despatch according to the ordinary time required for shipment of stock between Fremont and Buffalo.

Defendants pleaded the general issue with notice that the shipment referred to was "moved under and subject to provisions of the published tariffs of said defendants filed with the interstate commerce commission and the Michigan railroad commission" by the

terms of which the parties to this action are bound.

Upon the trial defendants' chief contention was that they were prevented from fulfilling their contract of carriage by a notice received from the Lake Shore railroad company of an embargo by it, refusing to receive cars of live stock at Toledo for eastern points unless they had 15 hours remaining out of the 36, in which stock must be fed, etc., on delivery to it at Toledo, based on a foot and mouth disease quarantine against imports of live stock which had been put into effect in the State of New York.

Defendants' counsel say in their brief that the legal points raised upon the record are as follows:

"1. Whether the Lake Shore and New York State embargoes constitute a defense for defendants' failure to move the stock to Buffalo.

"2. Failure of plaintiff to comply with the provisions of the contract requiring claim to be filed within five days.

"3. The verdict of the jury was contrary to law and against the just rights of defendants."

The point that plaintiff was precluded from his action by failure to comply with a provision in his shipping contract requiring a claim for damages to be made in prescribed form and manner within five days was not pleaded by defendants, which was a waiver of that defense under *Tobin* v. *Railway Co.*, 192 Mich. 549; and it is also shown that when first informed his stock had been unloaded at Plymouth, in a quarantined county, at a time he claimed they should have reached Buffalo and supposed they had, plaintiff notified defendants twice, by telegram, of his claim for resulting damages. Defendants were certainly advised promptly that a claim was made, so that a timely investigation of the facts could be had if desired, which is said to be the "obvious purpose of the notice"; *Slider* v. *Railroad Co.*, 194 Mich. 581; *vide,* also, *Sny-*

*der* v. *King,* 199 Mich. 345.    Under the foregoing decisions and authorities they cite, defendants' contention as to notice cannot be sustained.

The question most strenuously litigated in the trial court and argued in the briefs of counsel here is whether the Lake Shore embargo and New York quarantine constitute a good defense for defendants' failure to move the stock to Buffalo according to its contract of carriage.    It was the opinion of the trial court that they did not.

The stock was shipped under a regular "uniform live stock contract" of the kind discussed in *Snyder* v. *King, supra,* dated October 31, 1914.    The way-bill issued at Fremont showed the car of stock, P. M. 2256, consigned to Dunning & Stevens, East Buffalo, N. Y., "loaded, fed and watered 11 a. m. October 31, 1914," and it is stated in defendant's brief that it "went forward promptly from Fremont."    When it arrived at Plymouth does not appear.

The New York quarantine order offered and relied on by defendants is dated Albany, N. Y., October 31, 1914, entitled "Notice and order to prevent the bringing of foot and mouth disease into the State of New York," and signed by "Calvin J. Huson, commissioner of agriculture."    It prohibits bringing into the State of New York designated kinds of live stock, including sheep and swine, "from any one of the counties of Lenawee and Monroe, State of Michigan, and from any one of the adjacent counties of Wayne, Washtenaw and Hillsdale, State of Michigan," and various named counties in other States.    Newaygo county, Michigan, in which Fremont is located, and from which this stock was shipped, is not included in the quarantine.

Defendants' embargo notice from the Lake Shore & M. S. R. Co., addressed to "agents and connections," directs that "all cars en route prior to placing will be

accepted unless otherwise stated below." It is headed "extension," gives dates as "placed" October 30 and extended October 31, 1914, and states that "on account New York State authorities placing embargo on shipments of live stock coming from Wayne, Washtenaw and Hillsdale counties, Michigan, and Williams, Fulton and Lucas counties, Ohio," it would not accept shipments of stock originating in these counties, nor shipments of stock fed at the Toledo stockyards for shipment over its line to points in New York State. Newaygo county, Michigan, where this shipment originated, is not mentioned.

This was an interstate shipment, governed by the Federal laws. Under act of March 3, 1905 (section 8701 *et seq.*, U. S. Comp. Stat. 1916), congress took possession of the field and assumed control of such shipments, authorizing and directing the United States secretary of agriculture to determine the emergency and, where required, promulgate orders of quarantine as to interstate shipments of live stock. There can be no doubt this law is paramount and where the State law conflicts with it the latter must yield. It is stated in the reasons of the trial court for denying defendants' motion for a new trial, and not denied, that "The secretary of agriculture had issued quarantine orders covering Michigan and Ohio, becoming effective November 2, 1914, but which did not apply to cars in transit at that time."

The quarantine order issued by the commissioner of agriculture of New York was an absolute prohibition of interstate shipments into that State of any stock of the species named from the designated counties, whether healthy or diseased and infected. It goes further than to merely stop for inspection with a view to excluding diseased stock, as in *Asbell* v. *Kansas*, 209 U. S. 251, where this somewhat complicated question is reviewed and the distinction pointed out.

But aside from the foregoing, and assuming that the embargo by the Lake Shore railroad had the validity defendants claim, they are not in a position to invoke it under the facts in this case. At the time they accepted this carload of stock for transportation, they knew of facts by reason of which it was or might become impossible to fulfill their contract of carriage, which the shipper did not know and of which they did not give him notice.

Without informing plaintiff of the Lake Shore embargo or the New York quarantine order, defendants' line accepted this carload of stock in a county against which there was no quarantine, loaded and billed for interstate transportation to Buffalo, New York, over the route their agent advised, ran it into a county in Michigan against which there was a quarantine and out of which the stock could not be removed after unloading, there unloaded it, and nearly two days after it left Fremont notified him of the fact, when he supposed it had reached its destination according to the usual running time for such shipments.

On defendants' refusal to forward the car of stock to its destination or to Detroit in Wayne county without definite directions from him, plaintiff minimized his damages so far as possible by having the shipment taken to Detroit and there sold. The acceptance of the car load of stock and starting it on its way without notice to the shipper of the embargo claimed to have been placed upon their line was tantamount to the assurance that it would be delivered at its destination within a reasonable time and estops defendants from now claiming its operation as a defense for failure to fulfill their contract of carriage. If plaintiff had been informed at that time a different question would arise. *Eastern R. Co.* v. *Littlefield*, 237 U. S. 140.

An examination of defendants' remaining assign-

ments of error does not result in the conclusion that the verdict of the jury was contrary to law or against the just rights of defendants.

The judgment is affirmed.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.